CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUL 16 2018

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| KYMBER N., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:17-cv-00019 |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER | ) | By:   Joel C. Hoppe |
| OF SOCIAL SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Kymber N. asks this Court to review the Acting Commissioner of Social
Security's ("Commissioner") final decision denying her application for disability insurance
benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434.
The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 10. Having
considered the administrative record, the parties' briefs and oral arguments, and the applicable
law, I find that the Commissioner's decision is supported by substantial evidence and should be
affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final
decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.
Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not
"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for
that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court
reviewing the merits of the Commissioner's final decision asks only whether the Administrative
Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports
the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Kymber N. filed for DIB on November 15, 2013, alleging disability from neck pain and spasms radiating into the left arm, carpal tunnel syndrome and post-release symptoms, numbness and tingling in the left arm and hand, and lower back pain radiating into the right lower extremity. Administrative Record ("R.") 58–59, ECF No. 7-1. She alleged disability beginning on May 1, 2011, at which time she was forty-one years old. R. 58. Disability Determination Services ("DDS"), the state agency, rejected her application at the initial, R. 57, and reconsideration stages, R. 67, in 2014. On November 23, 2015, Kymber N. appeared with counsel for an administrative hearing before ALJ Mary Peltzer, R. 30, and testified about her medical conditions and alleged functional limitations, R. 36–50. A vocational expert ("VE") also testified at this hearing. R. 51–55.

ALJ Peltzer issued an unfavorable decision on January 21, 2016. R. 13–23. She first found that Kymber N. had not worked since May 1, 2011, and that she met the Act's insured-status requirements through September 30, 2013. R. 15. At step two, she found that, "through the date last insured, [Kymber N.] had the following severe impairment: post-operative lumbar and cervical spine disorders, to include degenerative disc/joint disease and stenosis." *Id.* All of her other physical conditions were deemed non-severe impairments. R. 15–16. At step three, ALJ Peltzer found that Kymber N.'s severe impairment did not meet or medically equal any of the impairments listed in the Act's regulations. R. 16. She then evaluated Kymber N.'s residual

functional capacity ("RFC")[1] as it existed during the period at issue. R. 17–22. She determined

that Kymber N. could perform sedentary work[2] with the following additional restrictions:

> occasional stairs and ramps; no ladders, ropes, or scaffolds; occasional stooping,
> kneeling, crouching, and no crawling; no reaching overhead (above the
> shoulders); frequent handling, fingering; no more than occasional exposure to
> extreme cold, vibration, and workplace hazards such as dangerous moving
> machinery, but no exposure to unprotected heights; tasks performed in a static
> work environment where changes in tasks are infrequent and explained when they
> do occur.

R. 16–17. Certain aspects of this RFC ruled out Kymber N.'s return to her past relevant work as

a secretary. R. 22; *see* R. 52. Finally, based on this RFC finding and the VE's testimony, ALJ

Peltzer concluded that Kymber N. was not disabled before September 30, 2013, because she

could have performed certain widely available sedentary occupations, such as inspector grader

and packer. R. 22–23. The Appeals Council denied Kymber N.'s request for review, R. 1–4, and

this appeal followed.

III. Facts

*A.    Relevant Evidence*

Kymber N. alleges that her conditions became disabling on May 1, 2011. R. 58. To

qualify for DIB, she "must prove that she became disabled prior to the expiration of her insured

status," *Johnson*, 434 F.3d at 656, on September 30, 2013. *See* 42 U.S.C. § 423(a)(1)(A),

(c)(1)(B); 20 C.F.R. § 404.131 (2015). In making this determination, the ALJ was required to

consider Kymber N.'s "complete medical history," 20 C.F.R. § 404.1512(d)(2), including any

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis in an ordinary work
setting despite his or her medical impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at
*1 (July 2, 1996).

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
[objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). A person who can meet
these lifting requirements can perform "the full range of sedentary work" if he or she can sit for about six
hours and stand and/or walk for about two hours in a normal eight-hour workday. *Hancock v. Barnhart*,
206 F. Supp. 2d 757, 768 (W.D. Va. 2002); *see also* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

relevant evidence created after her date last insured ("DLI") which suggested some link between her "post-DLI state of health and her pre-DLI condition," *Bird v. Comm'r of Soc. Sec. Admin*, 699 F.3d 337, 341 (4th Cir. 2012). Kymber N.'s arguments on appeal focus on her severe spine disorder(s), and in particular whether the "evidence of record supports [her] allegations of a less than sedentary RFC due to [her alleged] inability to maintain a static work posture, her need to lie down during the day, and her inability to use her arms and hands on more than an occasional basis"[3] because of those disorders. Pl.'s Br. 22, ECF No. 14; *see also id.* at 17, 21–22, 24, 25–28. Accordingly, I will limit my discussion of the record primarily to the evidence bearing on these issues.

> 1. *Medical Records*

On September 8, 2010, Kymber N. presented to her primary care provider, Heather Ball, PA-C, with posterior neck and shoulder pain that occasionally radiated into her left arm, causing decreased strength in that extremity. R. 417. On September 16, she told Preston Waldrop, M.D., and Michael Wilson, PA-C, that she had inexplicably "developed excruciating pain down the left arm." R. 224. The providers observed that Kymber N. was "very guarded of moving her neck very much" and noted that her pain manifested "along the C5-6 distribution." *Id.* An X-ray taken the same date showed "some spurring and decreased joint space," R. 225, and other "subtle changes at the C5-6 level consistent with . . . degenerative disc disease," R. 229. Kymber N. continued to report pain in her left arm and neck at clinic visits throughout the fall and winter of 2010. R. 218–19, 220, 221, 223, 246–47, 416. On October 27, endocrinologist James Bailey,

---

[3] At the administrative hearing, the VE testified that a hypothetical person with Kymber N.'s vocational profile and the RFC that ALJ Peltzer identified in her decision could perform certain sedentary occupations. R. 53–54. He also testified that further reducing the RFC to "occasional" handling and fingering would eliminate those sedentary occupations and that competitive employment would not be available to any person who needed to lie down "during the work day outside of the normally described breaks." R. 54–55. Neither the ALJ nor Kymber N.'s attorney asked the VE how an "inability to maintain a static work posture" would impact the hypothetical person's job prospects. *See* R. 51–55.

M.D., observed that she had a nonfocal motor and sensory exam except for "some weakness in her left upper extremity." R. 247. An MRI taken around the same time showed "a large disk herniation at C6-7," R. 221, and "significant spinal stenosis," which Dr. Waldrop considered "consistent with her clinical signs and symptoms," including pain "with any motion of the neck particularly rotation," R. 223. *See also* R. 227–28. This MRI also revealed a suspicious nodule on her thyroid gland. *Id.*

Dr. Waldrop and PA Wilson told Kymber N. that "[s]he may very well need operative intervention to decompress the left side" of her cervical spine, but that they wanted her to get her thyroid evaluated first. R. 223. Gregory Riebel, M.D., agreed that they needed to "make sure that this [was] not cancer before treating her symptomatic disc herniation." R. 222. On November 12, Dr. Bailey opined that "her thyroid surgery could wait until after her neck surgery, as her neck [was] causing her the most symptoms." R. 245. On December 15, Kymber N. told Dr. Riebel she wanted to "proceed with surgical treatment involving anterior cervical diskectomy and fusion [at] C5-6, C6-7," R. 219, because she had "tried conservative measures and [could] no longer tolerate" the pain and tingling in her neck and left arm, R. 218. This procedure was postponed for nearly a year because Dr. Riebel would not schedule surgery until Kymber N. recovered from the total thyroidectomny that she had on December 27, 2010. *See* R. 244, 360.

Kymber N. visited PA Ball again on July 7, 2011. R. 412–13. She denied any difficulty walking or muscle and joint weakness, but reported nondescript "back problems," lower back pain, joint pain, joint stiffness or swelling, and numbness or tingling sensations. *Id.* PA Ball attributed most of these symptoms to Kymber N.'s "neck issues" and cervical radiculopathy for which she was seeing Dr. Riebel. R. 413. Kymber N.'s musculoskeletal and neurological examinations were within normal limits on this visit. R. 412. On September 8, Kymber N. had an

appointment with David Kelly, M.D., "after a long absence" from his neurosurgery clinic. R.

346. Dr. Kelly had "previously taken care of her for a lumbar herniated disk" in 1999, and he

noted that she had "done very well from that standpoint." *Id.*; *see also* R. 360 ("[She] has a

history of herniated disk on the right at L5-S1 status post diskectomy on 7/29/1999 per Dr. Kelly.

She has mild chronic low back pain and intermittent chronic right leg pain. She denies any acute

lumbar symptoms."). On this visit, she reported "pain in her neck and down her left arm, which

ha[d] been quite severe on occasion" during the past year. R. 346. She denied any difficulty with

her gait or walking. *Id.* On examination, Dr. Kelly observed that Kymber N.'s neck was "quite

stiff" and there was "evidence of weakness [in] her triceps on the left." R. 346–47. He noted that

Kymber N.'s most recent MRI, which was "out of date being approximately a year old," showed

a herniated disc and "significant pathology at C6/C7." *Id.* He also introduced her to Alexander

Powers, M.D., "who discussed with her the likely possibility of surgery." R. 347.

Dr. Powers performed a left-sided C6-C7 microendoscopic discectomy on October 7,

2011. R. 360–62. Shortly before this procedure, Kymber N. reported "severe nerve pain," R. 297,

and "hand grip weakness" causing her to "drop[] things frequently," but denied any difficulty

with fine motor skills, R. 360. She was not taking any pain medication at this time. R. 300. A

preoperative physical examination showed intact sensation throughout, 4+/5 to 5/5 strength in

the right upper extremity, 4/5 strength in the left upper extremity, and limited range of motion in

the neck secondary to pain. *See* R. 297, 361. At her first follow-up visit on October 25, she told

Chase Michaels, PA-C, that her pain had "subsided," her strength was "improving," R. 345, she

had full range of motion in the left upper extremity, and she was now "gripping objects well," R.

344. Her physical examination showed intact sensation and "approximately 5/5 strength in the

upper and lower extremities throughout, with the exception to 4+ in the left hand grip and

intrinsics." R. 344. PA Michaels noted that he and Dr. Powers were "pleased" with Kymber N.'s

progress and that she was "clinically stable" at this time. R. 345. They directed her "to continue

to increase her activity with range of motion and stretching exercises" and noted that she had

"been instructed on what she can and cannot do." *Id.* This progress note does not document any

specific restrictions on her functioning. *See id.*

Kymber N.'s physical symptoms and functioning improved significantly as the months

passed. R. 342–43 (Jan. 2012), 239 (Feb. 2012), 339–40 (June 2012). On January 5, 2012, she

reported she had "been, again, increasing her activity with no problems" despite "some mild

neck soreness" and "some ongoing intermittent numbness." R. 342. Her physical examination

was normal, including 5/5 strength and intact sensation throughout. *Id.* PA Michaels and Dr.

Powers directed her "to increase her activity with range of motion and stretching exercises" and

noted that she had "been instructed again on what she can and cannot do including lifting." R.

343. This progress note does not contain any specific information about the restrictions on her

functioning. *See id.* On February 2, she told Dr. Bailey that she had "no neck pain" and "no focal

neurologic or musculoskeletal symptoms." R. 239. Indeed, she was "feeling well and ha[d] no

complaints or concerns" that day. *Id.* On June 4, Kymber N. told PA Michaels she had "not had

any neck pain or upper extremity pain," numbness, or weakness since her last visit six months

earlier. R. 339. However, she reported an "increase in low back pain with radiation to her right

hip." *Id.* Her physical examination was normal except for slightly diminished strength and

sensation in the right lower extremity over the L4-L5 dermatomes. R. 339–40. Dr. Powers told

Kymber N. to continue taking 800 mg ibuprofen as needed for pain and added Flexeril for

nighttime lumbar muscle spasms. *Id.* There is no indication in this progress note that she was

instructed to restrict her physical activities. *See* R. 340. On June 27, she told PA Ball that she

was suffering cold-like symptoms after having "just returned from a cruise to Belize." R. 411. Her musculoskeletal examination was normal, and she walked with a coordinated and smooth gait. *Id.*

On December 13, 2012, Kymber N. had a lumbar MRI to evaluate her apparent complaints of right-leg weakness and lower back pain.[4] R. 284–85. The study revealed multilevel lumbar spondylosis most prominent at L5-S1 with moderate foraminal narrowing, probable changes of right L5 laminectomy with abnormal tissue likely representing disc material rather than scarring. R. 284. Eight months later, Kymber N. told her endocrinologist that she "continue[d] to suffer from chronic back pain" and had "been seen by Neurosurgery for her back and disk issues." R. 281. On August 21, 2013, she had an epidural steroid injection ("ESI") at the right paramedian L5-S1, R. 289–92, apparently on Dr. Powers's recommendation, R. 472. Three weeks later, she told PA Ball that she felt "fine." R. 408. Her gait was coordinated and smooth, and her musculoskeletal examination was unremarkable. *Id.*

Kymber N. continued to receive treatment for her spine disorders and related symptoms after September 30, 2013. She had a second lumbar ESI in early October, R. 473, and reported neck and low back pain at an appointment with Dr. Powers later in the month, R. 470. Dr. Powers instructed her to continue physical therapy and increase her activity. *Id.* On December 3, Kymber N. visited PA Ball complaining of swollen ankles. R. 407. She had just returned from a week-long trip to New York where she did "lots of walking." *Id.* Kymber N. reported for the first time that she occasionally used a walker and had "some pain [with] ambulation." *Id.* Her gait was coordinated and smooth, and her musculoskeletal examination was normal except for edema in both legs. *Id.* PA Ball instructed Kymber N. to rest and elevate her feet "as able," given that

---

[4] Kymber N. first reported increasing lower back pain radiating into the right hip and leg during a visit with PA Michaels in early June 2012. R. 339. The medical record does not document any contemporaneous complaints of weakness in the lower extremities.

she was leaving later that day for a cruise to the Bahamas. *Id.* On December 12, Kymber N.

presented to Dr. Powers and PA Michaels for a "neurosurgical reevaluation" because she

"continue[d] to have neck pain with radiation into" both upper extremities with associated

"paraesthesias and grip weakness," R. 472, which were "unimproved with conservative

treatment," R. 477. On physical examination, she exhibited "decreased" sensation in both arms

and "pain and spasms" in her cervical and lumbar spine, but walked with a normal gait and had

4/5 to 5/5 strength throughout. R. 473–74. Dr. Powers noted that a recent MRI of the cervical

spine showed "ongoing stenosis of the cervical spine from C5-C7," near where he had performed

the discectomy two years earlier. R. 473. He diagnosed "progressive degenerative disk disease

with left-sided foraminal stenosis and radiculopathy at C5-C6 and C6-C7" and a "failed C5-C6

posterior laminotomy and foraminotomy." R. 485.

Dr. Powers performed an anterior cervical discectomy and spinal fusion on January 8,

2014. R. 475–78. Upon discharge, he instructed Kymber N. not to lift, drive, or engage in

"strenuous exercise" and to wear a hard collar while riding in a car. R. 478. At her first follow-up

visit on February 10, Kymber N. reported that she was "pleased with the outcome of surgery"

and was "improving," but still had "some mild neck discomfort." R. 485. She denied "any true

weakness, paresthesias, or paralysis." *Id.* Her physical examination showed full range of motion

in the neck, full strength with normal sensation in both upper extremities, and normal gait. R.

487–88. Dr. Powers instructed Kymber N. "to advance activities as tolerated" with range-of-

motion and stretching exercises. R. 488. On March 20, she again reported that she was

"improving," but had "some ongoing neck pain" that "at times" radiated into the upper

extremities. R. 491. "She denie[d] any upper or lower extremity pain, numbness, weakness,

parathesias, or paralysis." *Id.* As before, her physical examination showed full range of motion in

10

the neck, full strength with normal sensation in both upper extremities, and normal gait. R. 493.

Dr. Powers restricted her to lifting no more than fifteen pounds and advised her to be careful

with range of motion and pushing and pulling activities. R. 494. Subsequent progress notes from

Dr. Powers's clinic reflect similar reports of intermittent neck pain, along with some recurrent

numbness and tingling in the left arm, and generally unremarkable examinations of the neck and

upper extremities. R. 496–99 (July 2014), 505–07 (Jan. 2015), 532–35 (Mar. 2015), 542–44

(July 2015). They do not document any specific restrictions on Kymber N.'s physical

functioning. *See id.*

Kymber N. also continued to see Dr. Powers about her "progressive low back pain," for

which he prescribed medication and physical therapy. R. 496; *see* R. 502, 542. On January 22,

2015, she reported for the first time that she was experiencing pain that caused her to drag her

left foot as well as numbness and tingling in the lower extremities. R. 505. Dr. Powers ordered

an updated lumbar MRI to evaluate her "new" lower-extremity complaints and abnormal gait. R.

506. The MRI showed degenerative disc disease with neuroforaminal stenosis, but "no

significant change in lumbar degenerative changes" compared to the MRI taken in December

2012. R. 524. Kymber N. reported similar symptoms in March, July, and September 2015, but

nonetheless exhibited a normal gait, full muscle strength, normal sensation, and normal or simply

"decreased" range of motion on examinations during all three visits. *See* R. 532–34, 542–44,

554–60. In July 2015, Dr. Powers determined that lumbar-fusion surgery was appropriate

because multiple conservative treatment modalities had not provided adequate relief. R. 542.

That surgery was performed on September 8, 2015. R. 573–75. The discharging physician

instructed Kymber N. not to "bend, lift, drive, move furniture, or perform strenuous activity"

until cleared to do so at her first follow-up appointment. R. 568. There are no subsequent

medical notes in the record. *See* Pl.'s Br. 16.

    *2.*    *DDS Medical Opinions*

      On March 25, 2014, Richard Surrusco, M.D. reviewed Kymber N.'s records submitted to

DDS through that date. R. 59–61. Dr. Surrusco opined that, during the relevant period, Kymber

N. would have been able to occasionally lift and/or carry twenty pounds and frequently lift

and/or carry ten pounds; sit and stand and/or walk for about six hours each during a normal

eight-hour workday; push and/or pull without limitation, up to the weights and frequencies

shown for lift and/or carry; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl;

and never climb ladders, ropes, or scaffolds. R. 63–64. He explained that the postural restrictions

were intended to accommodate Kymber N.'s degenerative disc disease and first cervical

discektomy. *See* R. 61, 64. Dr. Surrusco did not identify any manipulative or environmental

limitations. *Id.* Donald Williams, M.D., concurred with Dr. Surrusco's opinions and rationale

after reviewing Kymber N.'s records in July 2014. *See* R. 69–71, 73–75.

    *3.*    *Kymber N.'s Testimony*

      At the administrative hearing in November 2015, Kymber N. testified that she could not

work after May 2011 because "between the neck, the arms, and the hips, [she was] very limited"

physically. R. 40. Her right hand "stay[ed] swollen" and had "no grip in it hardly anymore," and

she had "the same issue" in her left hand because of permanent nerve damage that would not

respond to yet another surgery. R. 40; *see also* R. 44–45, 49. If she turned her neck "a certain

way" or "quickly tr[ied] to move or anything," she felt a shocking sensation that caused her to

"drop whatever [she was] trying to get or do." R. 48. She spent most days "sitting with [her] feet

up, standing for a few minutes," and lying down on a heating pad "to get the pressure off of [her]

hips with the arm." R. 40–41. She estimated she would lie down "at least once an hour" and
could sit and stand for "probably 10 to 20 minutes at a time" before her "neck and back spasm."
R. 45–46. In October 2011, Dr. Powers told her not to use her left arm at all or to "lift[] anything
over two pounds or a two liter drink" bottle until she healed from her first neck surgery. R. 48.
Those functional restrictions still applied as of November 2015, *id.*, but they did not limit her
ability to shower or dress herself during the relevant time, R. 44. She had trouble when "trying to
lift anything above [her] head or bend[ing] down to get" something "if it had any weight." R. 43.
Family members had handled almost all of the household chores and shopping since well before
she allegedly became disabled in May 2011, R. 42–44, but she could fold laundry, microwave
frozen meals, and drive herself to the doctor or grocery store if necessary, R. 38.

B.    *The ALJ's Decision*

ALJ Peltzer considered Kymber N.'s spinal disorders and related functional limitations
throughout her written decision. At step two, she found that Kymber N.'s "severe impairment
[of] post-operative lumbar and cervical spine disorders, to include degenerative disc/joint disease
and stenosis," significantly limited her ability to perform basic work activities through
September 30, 2013. R. 15. At step three, she found that this impairment did not meet or
medically equal the listing for presumptively disabling disorders of the spine because there was
"no evidence of nerve root compression accompanied by sensory or reflex loss . . . or lumbar
spinal stenosis resulting in pseudoclaudication." R. 16 (citing 20 C.F.R. pt. 404, subpt. P, app. 1
§ 1.04 (2015)).

ALJ Peltzer then set out an accurate and reasonably complete summary of the evidence
related to Kymber N.'s spinal disorder and alleged functional limitations, including treatment
notes, diagnostic images, medical opinions, and Kymber N.'s statements both to her healthcare

providers and at the administrative hearing. R. 17–20. After considering this evidence, she found
that Kymber N. retained the RFC to perform sedentary work that involved (among other things)
at most "frequent" handling and fingering with either hand; "occasional" stooping, kneeling,
crouching, and climbing stairs or ramps; and never reaching overhead with either arm, crawling,
and climbing ladders, ropes, or scaffolds. R. 16–17. By restricting Kymber N. to sedentary work,
ALJ Peltzer found that she was capable of "lifting no more 10 than pounds at a time" and
performing tasks that primarily involve sitting with "standing or walking for about two hours in
an eight-hour workday." R. 17. She explained that this RFC was supported by the DDS
physicians' less-restrictive assessments of Kymber N.'s physical capacities as of September 30,
2013, "and the other evidence of record, including treatment notes," R. 22, which reflected
"relatively benign examinations during the period at issue" and, "[o]ther than her cervical
discectomy," a "limited degree of treatment required" for purportedly debilitating spinal
impairments, R. 20–21.

## IV. Discussion

    Kymber N. makes three related arguments on appeal, each of which challenges ALJ
Peltzer's RFC assessment. *See generally* Pl.'s Br. 16–29. A claimant's RFC represents her
"maximum remaining ability to do sustained work activities in an ordinary work setting on a
regular and continuing basis" despite her medical impairments. SSR 96-8p, 1996 WL 374184, at
*2 (emphasis omitted); *see* 20 C.F.R. § 404.1545. It is a factual finding "made by the
Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v.
Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined
functionally limiting effects of impairments that are supported by the medical evidence or the
claimant's credible reports of pain or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–

14

40 (4th Cir. 2015). The ALJ's RFC assessment must "include a narrative discussion describing"
how medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at
636, and explaining why he or she discounted any "obviously probative" conflicting evidence,
*Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). This discussion
should "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion,"
*Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863,
872 (7th Cir. 2000)), that the claimant retains a certain ability to sustain work-related activities,
*Mascio*, 780 F.3d at 636–37. "In other words, the ALJ must both identify evidence that supports
his conclusion and build an accurate and logical bridge from that evidence to [the] conclusion"
that the claimant is not disabled. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)
(quotation marks and alterations omitted).

Kymber N. offers several reasons why ALJ Peltzer's written decision fell short of these
standards. First, she asserts that the ALJ did not explain why she rejected Kymber N.'s
"allegations that she cannot maintain a static work posture, must lie down during the day, and
can only occasionally reach, handle, feel, and finger," Pl.'s Br. 24, which if credited would have
established "a less than sedentary RFC," *id.* at 22. Second, she argues that the ALJ did not
conduct the required "function-by-function analysis" and did not "make any specific findings
regarding [her] inability to maintain a static work posture, her need to lie down during the day, or
her manipulative limitations." *Id.* at 17; *see id.* at 21–22. In making both arguments, Kymber N.
broadly objects that ALJ Peltzer impermissibly required her "to objectively prove the intensity of
her pain," *id.* at 19, ignored or mischaracterized probative evidence, *id.* at 25–26, 28, and cherry
picked evidence from the record that supported the conclusion that Kymber N. was not disabled
before her DLI, *id.* at 21–22, 29. Her arguments are not persuasive.

A.      *Kymber N.'s Credibility*

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529; *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996), *superseded on other grounds by* SSR 16-3p, 2016 WL 1119029 (Mar. 2, 2016). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866; *see also Craig*, 76 F.3d at 594. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 639. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. When conducting this inquiry, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that she is disabled by pain or other symptoms caused by a medical impairment or related treatment; she cannot reject the claimant's description of her symptoms "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c). *See Lewis*, 858 F.3d at 866; *Hines*, 453 F.3d at 565. The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). The ALJ's articulated reasons for discounting a claimant's complaints need only be legally adequate and supported by substantial evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

ALJ Peltzer's RFC finding restricted Kymber N. to sedentary work with additional limitations on her postural activities and ability to use either upper extremity to reach overhead and manipulate objects. R. 17. At the beginning of her RFC analysis, ALJ Peltzer accurately summarized Kymber N.'s testimony that "she was not able to work" during the relevant time because she had "poor grip in her right hand," "problems with her left arm due to nerve damage," and she spent most days "with a heating pad" and "sitting with her legs elevated, standing for a few minutes, or lying down on her side to take pressure off her hips." R. 17; *see* R. 40–41, 44–45, 48–49. She also discussed Kymber N.'s statements describing how her spine disorders limited specific physical capacities and daily activities, including that she could not "lift over 2 pounds or a 2 liter drink" bottle, "it was hard for [her] to reach above her head," her "fingers go numb" when writing or using the computer, "she could sit or stand for about 10–20 minutes at a time before her neck and back started spasming," and she needed to lie down every hour. R. 18 (citing R. 43–46, 48). The ALJ's written decision included an accurate and reasonably thorough summary of the treatment notes and other medical evidence bearing on Kymber N.'s allegations that her pain and other symptoms were "so continuous and/or so severe," Pl.'s Br. 19, that she could not work at all.[5] *See* R. 18–22.

After considering this evidence, ALJ Peltzer found that Kymber N.'s spine disorders could reasonably be expected to cause her alleged symptoms, but that her statements describing the "disabling" intensity and "significant" functionally limiting effects of those symptoms during

---

[5] ALJ Peltzer did not mention any treatment notes created before May 2011, many of which documented Kymber N.'s complaints of severe neck pain and left-arm weakness at clinic appointments throughout the fall and winter of 2010. *See, e.g.*, R. 218–19, 220, 221, 223, 246–47, 416. This omission undermines the ALJ's subsequent finding that Kymber N. waited until September 8, 2011, before "finally" mentioning to a healthcare provider that she had been suffering from "disabling" neck pain for the past year, R. 21. As explained below, however, this omission does not detract from the ALJ's accurate observation that Kymber N. often failed to report, or expressly denied, neck pain and related symptoms throughout the period at issue.

the period at issue were "not entirely credible" because "the degree of severity alleged lack[ed] support and consistency with the other evidence of record." R. 17–18, 20, 21. As support for this finding, she cited Kymber N.'s failure to "mention neck or back pain at her first three physician visits after her alleged onset date," the "limited degree of treatment required and relatively benign examinations during the period at issue," progress notes indicating that Kymber N.'s symptoms generally subsided for more than a year after her first neck surgery, evidence that she went on a cruise to Belize and a week-long trip to New York where she did "a lot of walking" during (or very shortly after) the period at issue, and the fact that "no treating physician ha[d] opined" during this time that Kymber N. had "limitations greater than those" ALJ Peltzer included in her RFC assessment. R. 20–21. Her summary of the treatment notes also cites several instances where Kymber N. either did not mention or specifically denied experiencing significant pain, weakness, or numbness attributable to her spine disorders. R. 18–20 (citing R. 339–40, 342–43, 344–45, 408, 409, 410, 411, 414).

Kymber N. primarily takes issue with the ALJ's purported failure "to specifically address [her] allegations regarding difficulty sitting and standing due to pain and weakness, her need to lie down during the day, or her manipulative limitations with regard to reaching in directions other than overhead, handling, feeling, and fingering." Pl.'s Br. 24. She urges that ALJ Peltzer's credibility determination is "not specific enough to provide guidance . . . as to why she rejected" these allegations because she did "not make specific findings" about Kymber N.'s "inability to maintain a static work posture, [her] need to lie down during the day, or her manipulative limitations, including an inability to grip with either hand." *Id.* I disagree.

First, ALJ Peltzer specifically discussed Kymber N.'s testimony that she could sit and stand for at most 20 minutes before her neck and back start "spasming," she needed to lie down

18

every hour, her right hand had "no grip in it hardly anymore," and she could not use her left arm

at all after her neck surgery in October 2011, R. 17–18, and she gave specific reasons why these

"significant" functional limitations "lack[ed] support and consistency with" other relevant

evidence in the record, R. 20–21 (citing, among other reasons, the "limited degree of treatment

required" other than Kymber N.'s first discectomy, as well as progress notes indicating that her

symptoms generally subsided for more than a year after this surgery; the "relatively benign

examinations during the period at issue"; and evidence that "no treating physician ha[d] opined

that Kymber N. had "limitations greater than those" included in the RFC finding). *See Bishop*,

583 F. App'x at 68 (finding no error where "the ALJ cited specific contradictory testimony and

evidence in analyzing Bishop's credibility and averred that the entire record had been

reviewed"). Second, although Kymber N. testified that she had trouble kneeling and bending and

that she spent most of the day alternating between sitting, standing for a few minutes, and lying

down, R. 40–41, 43–44, she does not point to *any* specific piece of evidence in the record that

she could not "maintain a static work posture," Pl.'s Br. 21 (citing R. 16–21). *See* SSR 96-8p,

1996 WL 374184, at *3 ("[W]hen there is no allegation of a . . . limitation or restriction of a

specific functional capacity, and no information in the case record that there is such a limitation

or restriction, the [ALJ] must consider the individual to have no limitation or restriction with

respect to that functional capacity."). The ALJ explained why she found Kymber N.'s testimony

to be inconsistent with the record as a whole, R. 17–18, 20–21, and there is no indication that she

ignored any available information about Kymber N.'s "difficulty sitting and standing," Pl.'s Br.

24, or "inability to maintain postural activities" on a regular and continuing basis, *id.* at 28. *See*

*Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Finally, ALJ Peltzer explained

that her RFC finding limited Kymber N.'s exertional, postural, and manipulative capacities—

including only occasionally stooping, crouching, and kneeling; frequently using the hands and

fingers to manipulate objects; and never using either arm to reach overhead—in order to

accommodate her post-operative spine disorders. R. 17, 21. Additional postural and manipulative

restrictions simply were not supported by the record, as the ALJ explained throughout her

written decision. *See* R. 18–21. This explanation permits the Court to determine whether the

ALJ's articulated reasons for discounting Kymber N.'s statements were legally adequate and

supported by substantial evidence. *See Mascio*, 780 F.3d at 639; *Bishop*, 583 F. App'x at 68.

Kymber N. also argues that ALJ Peltzer's credibility determination is fatally flawed

because the ALJ purportedly required Kymber N. "to objectively prove the intensity of her pain,"

minimized or ignored medical evidence that supported her disability claim, mischaracterized the

nature of her medical treatment and positive response to neck surgery, and found that her trip to

New York in December 2013 was "the defining episode of non-disability" in her case. Pl.'s Br.

19, 25–28. She does not challenge ALJ Peltzer's findings that Kymber N. often either did not

mention, or specifically denied, experiencing relevant symptoms and functional limitations at

clinic visits throughout the period at issue, *see* R. 18–20, and that "no treating physician ha[d]

opined" during this time that Kymber N. had specific, ongoing functional "limitations greater

than those" included in the RFC determination, R. 21. These findings are supported by

substantial evidence in the record, *see, e.g.*, R. 343, 345, 496–99, 505–07, 532–35, 542–44, and

provided legitimate grounds for the ALJ to discount Kymber N.'s subjective complaints. *See*

*Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va. May 12, 2015) (finding no

error in the ALJ's adverse credibility determination where the claimant's medical record showed

that she repeatedly either failed to report or expressly denied the symptoms that she described in

her hearing testimony); *cf. Justus v. Soc. Sec. Admin.*, No. 4:14cv45, 2015 WL 5510921, at *8

(W.D. Va. Sept. 17, 2015) ("[A] treating physician's failure to impose 'symptom-related

functional limitations and restrictions' can weigh against the claimant's credibility." (quoting 20

C.F.R. § 404.1529(c)(3)).

      ALJ Peltzer did not require Kymber N. to produce objective evidence to corroborate her

reports of pain and other symptoms. Contrary to Kymber N.'s suggestion, there is no reason to

think that an ALJ "impermissibly requires [a] plaintiff to objectively prove the intensity of her

pain" whenever the ALJ states her overall credibility finding and "then turns to the objective

medical evidence of record in analyzing [the] plaintiff's allegations of disabling symptoms and

limitations," Pl.'s Br. 19, as ALJ Peltzer did in this case, R. 18–20. ALJ Peltzer cited the

"relatively benign examinations during the period at issue" as one of several legitimate factors

cutting against Kymber N.'s allegations that her spine disorders caused "disabling symptoms"

and "significant functional limitations" during the same time. R. 21. *See Hines*, 453 F.3d at 564

n.3 ("Although a claimant's allegations about her pain may not be discredited solely because

they are not substantiated by objective evidence of the pain itself or its severity, they need not be

accepted to the extent they are inconsistent with the available evidence, including objective

evidence of the underlying impairment, and the extent to which that impairment can reasonably

be expected to cause the pain the claimant alleges she suffers." (quoting *Craig*, 76 F.3d at 595)).

This finding is supported by substantial evidence in the record. For example, although Kymber

N. testified that "between the neck, the arms, and the hips, [she was] very limited" physically, R.

40, her physical examinations were generally within normal limits except for decreased strength

and diminished sensation in the left upper extremity and pain with range of motion in the neck

before her first surgery on October 7, 2011, R. 223, 224, 247, 297, 346–47, 361, 412. Her neck

pain and related abnormalities—including diminished grip strength and sensation—improved

considerably after this surgery and were essentially stable until early December 2013, when Dr. Powers determined that a second surgery was warranted. R. 239, 275, 281, 339–40, 342–43, 344–45, 408, 472. Two months after that surgery, in March 2014, Dr. Powers limited Kymber N. to lifting no more than fifteen pounds until her next evaluation, R. 494, but that limitation, which appears temporary, was less restrictive than the ALJ's lifting limitation of at most ten pounds, R. 17. Kymber N. consistently walked with a smooth and normal gait, R. 346, 405, 407, 408, 411, 412–13, 487–88, 493, except one time more than a year after her DLI when she reported increasing lower back pain and "new" lower extremity symptoms that caused her to drag her foot and walk with an abnormal gait, R. 506 (Jan. 2015). Dr. Powers also repeatedly told her to increase her physical activity during the period at issue, R. 342, 345, 470, which, as the ALJ noted, reasonably suggests that Kymber N. was not as functionally limited as she claims, R. 21.

Kymber N. also objects that ALJ Peltzer "minimize[d] the objective medical evidence" related to her lumbar impairment, Pl.'s Br. 25, but she does not identify any reversible error in the ALJ's summary of the relevant medical records or her analysis of that impairment and related functional limitations as they existed *before* September 30, 2013. *See Parker v. Berryhill*, --- F. App'x ---, 2018 WL 2113790, at *2–3 (4th Cir. May 8, 2018) (per curiam) (citing *Bird*, 699 F.3d at 340–42). For example, although she faults the ALJ for "indicatin[g that] there was really no reason" for Kymber N. to have surgery in September 2015, Pl.'s Br. 25, she does not dispute that findings on contemporaneous physical exams were generally unremarkable and that an MRI taken in February 2015 to evaluate Kymber N.'s new lower-extremity symptoms "showed no significant change in her lumbar degenerative changes" compared to the MRI taken in December 2012. R. 20 (citing R. 525, 532–34, 542–44, 554–60). Instead, she cites much of the same medical evidence that ALJ Peltzer considered in her RFC analysis and asserts that the ALJ

should have ruled in her favor. *See* Pl.'s Br. 22, 24–25; R. 20. This Court "cannot simply look at

the same evidence and reverse the ALJ on the basis that it could have reached a different result."

*Carr v. Berryhill*, No. 6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18, 2017).

ALJ Peltzer did find that Kymber N. had "not generally received the type of medical

treatment one would expect for a totally disabled individual" because, "other than her cervical

discectomy, [she] did not require any hospitalizations, emergency department visits, or even

frequent physician intervention for her severe" degenerative disc/joint disease before September

30, 2013. R. 20–21 ("The limited degree of treatment required . . . during the period at issue

belie[s] allegations of disabling symptoms or functional limitations."). She also found that

Kymber N. initially responded very well to her neck surgery in October 2011, R. 21, and that her

residual symptoms were "treated conservatively until January 2014 when she underwent another

anterior cervical discectomy and fusion," R. 20 (citing R. 470–83). Kymber N. objects that ALJ

Peltzer "mischaracterize[d] the evidence" bearing on this factor, Pl.'s Br. 26, but, again, she

merely cites to the same evidence that the ALJ considered without identifying any reversible

error in the ALJ's assignments of weights or analysis, *see id.* at 26–27. *Cf. Dunn v. Colvin*, 607

F. App'x 264, 271 (4th Cir. 2015) ("We must defer to the ALJ's assignments of weight unless

they are not supported by substantial evidence.").

"[I]t is well established in this circuit that the ALJ can consider the conservative nature of

a claimant's treatment in making a credibility determination," *Dunn*, 607 F. App'x at 275, and

substantial evidence supports the ALJ's decision to consider it as a factor in discounting Kymber

N.'s allegations in this case. 20 C.F.R. § 404.1529(c)(3). Kymber N. had one surgery during the

period at issue to address her neck and left-arm pain after which she followed up with healthcare

providers every few months and reported a positive response to surgery. R. 239, 339–40, 342–

43, 344–45, 408. Dr. Powers recommended "conservative treatment," R. 477, such as ibuprofen and physical therapy, to manage her residual symptoms until a second neck surgery was performed in January 2014. Dr. Powers also prescribed medication, muscle relaxants, stretching exercises, physical therapy, and steroid injections to manage Kymber N.'s back pain until he eventually performed lumbar surgery in early September 2015, nearly two years after her DLI. R. 542. Contrary to Kymber N.'s assertions, no evidence in the record indicates that this surgery or any other "treatment of her low back was put on hold until her more pressing neck impairment was addressed." Pl.'s Br. 20. Instead, the record shows that Kymber N. first reported increasing lower back pain in June 2012, R. 339, and that Dr. Powers opted for conservative measures for the next three years before finally determining in July 2015 that lumbar-fusion surgery was warranted. R. 542. Thus, there is no suggestion that Kymber N. "required more aggressive treatment" for lumbar degenerative disc disease before her DLI "yet received conservative treatment for other reasons." *Dunn*, 607 F. App'x at 275. It was ALJ Peltzer's role to weigh this evidence against Kymber N.'s testimony describing disabling pain and limitations in determining the extent to which her spine disorders actually limited her capacity to work. The routine, mostly non-invasive nature of Kymber N.'s treatment and the significant relief afforded by surgery during the period at issue were legitimate grounds upon which the ALJ could question the severity of her medical conditions. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."); *Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *1, *5 (W.D. Va. May 6, 2016) (concluding that the ALJ reasonably found pain medications, physical therapy, and steroid injections constituted "conservative" treatment for degenerative disc disease and properly relied

24

on the nature of such treatment in discounting the claimant's complaints of debilitating lower-back and leg pain), *adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016).

Finally, nothing in ALJ Peltzer's decision indicates that she found Kymber N.'s December 2013 trip to New York to be "*the* defining episode of non-disability" in her case. Pl.'s Br. 25 (emphasis added). She merely cited Kymber N.'s comment to PA Ball that she did "a lot of walking" on that week-long trip, albeit with some resulting swelling, as one more reason to question Kymber N.'s testimony that she was very limited in what she could do physically. R. 21 (citing R. 407).

Overall, Kymber N. does not explain how a very limited RFC restricting her to a reduced range of work that "primarily involves sitting," R. 17, failed to reasonably accommodate her back pain and lower-extremity symptoms. *See* Pl.'s Br. 24–25. Considering the objective medical evidence, Kymber N.'s initial positive response to neck surgery, her course of treatment, and the absence any specific, ongoing functional limitations imposed by medical professionals before her DLI, the ALJ could reasonably question the severity and limiting effects of Kymber N.'s medical conditions and related symptoms during the period at issue. Indeed, Kymber N. does not "point to any specific piece of evidence not considered by" ALJ Peltzer that might have changed her adverse credibility determination or her conclusion that Kymber N.'s impairments were not disabling before her DLI. *Reid*, 769 F.3d at 865 (emphasis omitted); *see Parker*, 2018 WL 2113790, at *2–3. Put another way, ALJ Peltzer reached a different conclusion than Kymber N. about the severity of her pain and other symptoms during the relevant time, but she nonetheless acknowledged that Kymber N.'s complaints appeared throughout the medical record and, in her RFC assessment, accounted for them to a significant degree by restricting her to sedentary work with additional limitations on her postural and manipulative capacities. *See* SSR 96-9p, 1996 WL

25

374185, at *3 ("Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations" but are not presumed disabled). Accordingly, I find that the ALJ's credibility determination is legally adequate and supported by substantial evidence. *See Bishop*, 583 F. App'x at 68 (citing *Eldeco, Inc.*, 132 F.3d at 1011).

B.    *Function-by-Function Analysis*

Kymber N. next asserts that ALJ Peltzer did not conduct a function-by-function analysis of her ability to work on a regular and continuing basis. *See* Pl.'s Br. 16–17 (citing SSR 96-8p, 1996 WL 374184). Social Security Ruling 96-8p "instructs that the [RFC] 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations," before the RFC finding can "be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."[6] *Mascio*, 780 F.3d at 636 (quoting SSR 96-8p, 1996 WL 374184, at *1); *see* 20 C.F.R. § 404.1545(b)–(d). An ALJ's failure to "perform an explicit function-by-function analysis" does not automatically require reversal and remand, however. *Mascio*, 780 F.3d at 636. "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)).

ALJ Peltzer's RFC determination restricting Kymber N. to sedentary work includes a function-by-function analysis of her maximum remaining abilities to lift and carry certain

---

[6] Requiring the ALJ to conduct this "initial function-by-function assessment" of the claimant's ability to perform "specific work-related functions" before expressing the RFC in terms of the exertional levels of work largely guards against the risk that the ALJ will "either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." SSR 96-8p, 1996 WL 374184, at *3, *4.

weights; to sit, stand, and walk during a normal eight-hour workday; to reach overhead with

either arm and to use either hand for "handling [and] fingering" objects; and to perform postural

activities like climbing, stooping, crouching, and crawling. R. 17; *see* R. 18, 21–22. Yet, Kymber

N. objects that the ALJ did not "make any specific findings regarding [her] inability to maintain

a static work posture, her need to lie down during the day, or her manipulative limitations," Pl.'s

Br. 17, and that this omission essentially leaves the court to guess about how the ALJ made her

RFC determination. *See id.* at 21–22 (citing *Monroe*, 826 F.3d at 189; *Mascio*, 780 F.3d at 636).

This argument mirrors Kymber N.'s overarching objection to the ALJ's credibility assessment,

and it fails here for the same reasons it did there.

ALJ Peltzer's narrative discussion of Kymber N.'s RFC makes clear "which evidence

[she] found credible and why," *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013), and

adequately explains why she discounted or rejected any "obviously probative" evidence, *Arnold*,

567 F.2d at 259, indicating that Kymber N.'s spine disorders caused additional or more

restrictive functional limitations before her DLI. For example, it is clear that ALJ Peltzer chose

not to include other restrictions on the upper extremities because Kymber N.'s grip strength and

sensation improved considerably after her first neck surgery in October 2011, and her testimony

that Dr. Powers had imposed significant, ongoing restrictions after that surgery, R. 48, was not

borne out by the record as a whole, R. 21 ("[T]he claimant testified that she received ongoing

limitations from Dr. Powers after her cervical surgery in 2011, but these limitations are not

specified in the record . . . ."). Similarly, the RFC finding does not reflect Kymber N.'s alleged

"need to lie down during the day," Pl.'s Br. 17, because ALJ Peltzer reasonably found this

testimony to be inconsistent with other relevant evidence, including that Kymber N. went on

several vacations before or shortly after her DLI and that physicians "repeatedly instructed her to

27

increase her physical activity" during the same time, R. 21. Kymber N. does not point to any

evidence in the record showing that she could not maintain a static work posture during the

period at issue. Thus, this is not a case where the ALJ overlooked conflicting evidence about the

claimant's work-related abilities or limitations, *see Mascio*, 780 F.3d at 637, or otherwise "failed

to 'build an accurate and logical bridge from the evidence to [her] conclusion'" regarding the

claimant's RFC, *Monroe*, 826 F.3d at 189 (quoting *Clifford*, 227 F.3d at 872). Accordingly, I

find that substantial evidence supports the ALJ's RFC determination.

## V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**DENY** Plaintiff's Motion for Summary Judgment, ECF No. 13, **GRANT** the Commissioner's

Motion for Summary Judgment, ECF No. 15, **AFFIRM** the Commissioner's final decision, and

**DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United

States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 16, 2018

Joel C. Hoppe
United States Magistrate Judge